375 A.2d 1320

The FIDELITY BANK, Trustee of the Estate of George
H. Tiernan

v.

Walter F. TIERNAN and Margaret R. Lynagh, Appellants.

Superior Court of Pennsylvania.

Argued Dec. 12, 1975.

Decided June 29, 1977.

Joseph W. Fullem, Jr., Philadelphia, for appellants.

Paul Maloney, Philadelphia, for appellee.

Before WATKINS, President Judge and JACOBS, HOFF-MAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

Four members of the court are in agreement that the judgment of the lower court cannot stand. The President Judge and I would enter judgment n.o.v. Judge HOFF-MAN and Judge CERCONE, however, would only grant a new trial; they do not find it necessary to decide the issue that the President Judge and I regard as dispositive. In these circumstances, so that there may be an order supported by a majority of the court the President Judge and I concur in the granting of a new trial. The reasons for a new trial are stated in Judge HOFFMAN's opinion; the reasons for judgment n.o.v., in this opinion.

-1-

George Tiernan died in 1933, leaving the residue of his estate to the Fidelity Bank in trust, to be divided into two equal shares, one for his son Walter, and the other for his son Arnold. With respect to each son, the Bank was to pay income on the son's share to the son for his life, and on the son's death to his widow, and on her death to "all my grandchildren then living . . ., said income to be paid

until each of said grandchildren shall attain the age of twenty-five years . . .. As each grandchild attains the age of twenty-five years, his or her share of principal shall be promptly distributed to him or her . . .." (Record 128a–129a)

Walter died a widower in 1963. At that time "all [of George's] grandchildren" were: Walter's two children, Walter F. and Margaret; and Arnold's three children, Arnold G., Elizabeth, and Edith. All of these grandchildren were over 25. Accordingly, on Walter's death the Bank should have divided the principal of his trust into five equal parts, and distributed one part to each grandchild. Instead the Bank divided the principal, which amounted to some $62,000, into two equal parts, and distributed one part to each of Walter's children, Walter F. and Margaret. Thus, Walter F. and Margaret each received some $31,000; they should each have received only some $12,000, with Arnold's children, Arnold G., Elizabeth, and Edith, also each receiving some $12,000.

This improper distribution of the principal of Walter's trust was accomplished informally, that is, instead of filing its account for audit by the Orphans' Court the Bank procured the signatures of Walter F. and Margaret to a "Receipt, Release and Waiver of Audit." This document, which was prepared by the Bank, opens by reciting, "We, the undersigned, being the sole parties in interest in this Trust . . .." As just noted, this recitation was not accurate. The document goes on to provide that "for the purpose of inducing the Trustee [the Bank] to make a distribution without a Court audit," Walter F. and Margaret:

1. Acknowledge that we have examined the Trustee's account and approve the same . . . .
2. Acknowledge receipt of principal in the amount of $62,225.12 . . . .
3. Agree to indemnify the Trustee against all liability, loss or expense which may be incurred as the result of the settlement of this Account, or of the distribution being made upon this Receipt and Release to the extent of our share, and

4. Waive an accounting of this Trust in the Orphans'
Court . . . .
(Record 134a)

Arnold died in 1968, survived by his widow and three children. This time, however the Bank filed a formal account in the Orphans' Court. The Orphans' Court adjudicated the account on December 10, 1971, awarding the principal of Arnold's trust back to the Bank in further trust for Arnold's widow. Incident to this proceeding, evidently in August 1971 (Record 137a–138a, 156a), the overpayment to Walter's children was discovered.

On March 10, 1972, the Bank filed a formal account in the Orphans' Court of Walter's trust. On October 19, 1972, the Orphans' Court adjudicated that account. The adjudication held that "[t]he testator's will . . . clearly and plainly pertinently provides for the distribution of income after the death of Walter and after the death or remarriage of his wife . . . equally to *all* of the testator's then living grandchildren . . .." (Record 139a; emphasis in original.) Accordingly the court ordered the Bank to distribute the principal of Walter's trust equally to all five grandchildren. Since the Bank had already distributed the principal to Walter's two children, this meant that it was surcharged some $36,000 ($12,000 for each of Arnold's three children), with interest from July 19, 1963, which was the date of the Receipt, Release and Waiver of Audit and distribution to Walter's children. (Record 145a)

-2-

The foregoing facts presented the Bank with a choice. First, the Bank could proceed against Walter F. and Margaret in assumpsit for breach of their express promise, made in Paragraph 3 of the Receipt, Release and Waiver of Audit, "to indemnify the [Bank] against all liability, loss or expense which may be incurred as the result of the settlement of this account . . . ." Second, the Bank could proceed against Walter F. and Margaret for restitution. As a matter of pleading, this would also be in assumpsit. 1 Standard

Pennsylvania Practice (Rev. ed. 1960) ch. 3, § 29; Restatement of Restitution § 5 (1937). As a matter of theory, however, it would differ from the proceeding on the Receipt, Release and Waiver of Audit in that it would not depend upon proof of breach of an express promise but on whether as a matter of equity it was unjust for Walter F. and Margaret to retain the benefit they had received as a result of the Bank's overpayment to them. Restatement of Restitution, Part I, Introductory Note, and § 1. Or third, the Bank could combine these two proceedings, for example by suing in Count 1 of its complaint for breach of the express promise to indemnify and in Count 2 for restitution. Pa.R. Civ.P. 1020(a), (c).

In fact the Bank chose the first of these three possible procedures, and on April 4, 1972, it filed a praecipe for summons, followed on May 5, 1972, by a complaint in assumpsit for breach of the express promise to indemnify. (Record 1a, 3a–4a) Paragraph 1 of the complaint pleads George Tiernan's will. Paragraphs 2 and 3 identify his five grandchildren (Walter's two children, and Arnold's three). Paragraph 4 pleads the Receipt, Release and Waiver of Audit. Paragraph 5 states that the principal of Walter's trust "should have been divided among all five of the grandchildren." Paragraph 6 states that "[a]s a result of the distribution" made pursuant to the Receipt, Release and Waiver of Audit, Walter F. and Margaret each "received $19,003.19 more than the amount to which they were entitled." And paragraph 7 quotes the express promise made by Walter F. and Margaret in Paragraph 3 of the Receipt, Release and Waiver of Audit to indemnify the Bank. Wherefore judgment is demanded in the sum of $38,006.38.

-3-

It is important to understand that in deciding to sue for breach of the express promise to indemnify, able counsel gave the Bank its best chance. There are two reasons why this is so.

First, the scope of the material evidence would be narrower, and this would favor the Bank. In a suit for restitution,

the respective equities of the parties would become material, for whether it is unjust for one to retain a benefit will depend upon all the circumstances. Thus the right to restitution may be lost because of one's delay, Restatement of Restitution § 64, or because of laches, *id*, § 148, or because of a change in the circumstances of the person who has received the benefit, *id.* § 69. It could be anticipated that factors such as delay and change of circumstances might favor Walter F. and Margaret, and in fact they did testify to that effect. (Record 52a–53a; 62a–64a) If the suit were for breach of the express promise to indemnify, however, such testimony should be immaterial, for the issues would not be equitable but would rather concern only the meaning and validity of the promise.

Second, and more decisive than these evidentiary considerations, a suit for restitution would be barred by the statute of limitations, whereas it is at least arguable that a suit for breach of the express promise to indemnify would not be.

That a suit for restitution would be barred may be seen from *Montgomery's Appeal*, 92 Pa. 202 (1879). The administrators of the estate of William Montgomery overpaid his widow Matilda. The overpayments occurred during 1870 and 1871; they were made voluntarily by the administrator, and "[n]o refunding bond, or agreement to repay, was asked for . . . ." *Id.* 92 Pa. at 204. In 1876 one of the administrators, A. J. Montgomery, made a voluntary assignment in trust for creditors. Pursuant to this assignment certain land was sold in which Matilda had an interest. The auditor, however, refused to pay the amount of this interest to Matilda, arguing that she was indebted to A. J. Montgomery because of the overpayment he had made her when he was one of the administrators of her husband's estate; as it happened, the overpayment exceeded the amount of her interest in the land sold in settlement of Montgomery's assignment for creditors. The lower court upheld the auditor. On Matilda's appeal, the Supreme Court reversed. The Court held that the creditors (whose rights the auditor represented) were not entitled to set-off against Matilda

for the reason that A. J. Montgomery could not himself recover the money back [*i. e.,* the overpayment he had made to Matilda]. The payment was voluntary, and it is barred by the Statute of Limitations . . . The auditor and court below were of opinion, however, that the statute did not begin to run until the overpayment was discovered, to wit: in 1876. But when an administrator pays out money, he is presumed to know the condition of the estate. The assets are in his hands, and he is familiar with their amount and value. He ought to know, and is chargeable with knowledge, of the amount of claims against the estate, when he makes a payment on account of a distributive share. It would be a great hardship upon distributees, to whom an administrator has voluntarily made payments on account of their shares, if they may be called upon for repayment after the lapse of years. They may have spent it, or increased their style of living in entire good faith, and in ignorance of any overpayment. We are of opinion that the statute commences to run against the administrators from the time of such payments.

*Id.* 92 Pa. at 206.

Here, the Bank made the voluntary overpayment to Walter F. and Margaret on July 19, 1963; its praecipe for summons was not filed until April 4, 1972.

It was remarked above that "it is at least arguable" that the Bank avoided the bar of the statute of limitations by deciding to sue for breach of the express promise to indemnify instead of for restitution. This expression was used by way of noting the disagreement between Judge VAN der VOORT and Judge HOFFMAN, regarding the statute of limitations. Judge VAN der VOORT has concluded that the Receipt, Release and Waiver of Audit is under seal and that therefore the appropriate limitation period is twenty years. Dissenting at 1331–1332. Judge HOFFMAN in his concurring opinion, at footnote 2, has concluded that no seal having been pleaded, none is in evidence, and that therefore the appropriate limitation period is six years. He goes on to say,

however, that even so, the Bank is not barred because the statute did not start to run until the Bank suffered a loss. Regarding this latter point: The express promise to indemnify was not simply to indemnify against loss but "against all *liability,* loss or expense which may be incurred . .." (Record 134a, emphasis added.) Query: Did the Bank incur a "liability" to Arnold's children when it made its improper distribution in 1963 to Walter's children? If so, perhaps the statute began to run then, in which case, if Judge HOFFMAN is right about the six years, even an action for breach of the express promise to indemnify is barred.

-4-

So far as the statute of limitations is concerned, it is unnecessary to choose between Judge VAN der VOORT's and Judge HOFFMAN's opinions. It may be assumed either that Judge VAN der VOORT is right that the appropriate limitation period is twenty years, or that Judge HOFFMAN is right that it is six years, and that he is also right that the statute did not start to run until the Bank suffered a loss. In other words, one may accept as correct the judgment of the Bank's counsel that if they sued for breach of the express promise to indemnify, instead of for restitution, the action would not be barred. Even so, the action must fail.

Since the action is not for restitution but for breach of the express promise to indemnify, one must look to the language of the promise. Doing so, one will observe that the language does not include a promise "to indemnify the [Bank] against all liability, loss or expense which may be incurred as the result of [*the Bank's own negligence* in] the settlement of this account . . .." [1]

The omission of such an express promise to indemnify the Bank against the results of its own negligence does not

1. There can be no issue that there was negligence. As noted by the judge of the Orphans' Court, when he adjudicated the Bank's account, the will "clearly and plainly pertinently provides for . . distribution . . . equally to *all* of the . . . grandchildren . . . .." (Record 139a) Either the Bank's employee responsible for distributing Walter's trust did not read the will, or he read it so

trouble the dissent, which, without citation of authority, simply states:

> The appellants [Walter F. and Margaret] next argue that the Bank's action is "insufficient as a matter of law" since the claim for indemnification on the contract is based upon the Bank's own negligence. [We] have heretofore recited the exact words of the indemnification agreement, which broadly, but with clarity, evince the appellants' intent to indemnify the Bank against any liability, loss, or expense arising due to the distribution. There is no language excluding situations caused by appellee's negligence from the appellants' assumption of indemnification liability. [We must reject] appellants' claims that the indemnification language is unclear, susceptible to differing interpretations, or otherwise ambiguous in conveying the intent of the parties to the instrument.

Dissenting at 238.

This statement misses the critical point of this case, which is not that "[t]here is no language *excluding* situations caused by [the Bank's] negligence" (emphasis added), but that there is no language *including* such situations. If, in other words, a party is to be indemnified against the results of its own negligence, the contract upon which it relies must provide for such indemnification in so many words. Here the contract—the Receipt, Release and Waiver of Audit—does not so provide. Therefore, the Bank may not recover in a suit based on the Receipt, Release and Waiver of Audit.[2]

This statement of the law is long-settled. Thus, in *Crew v. Bradstreet,* 134 Pa. 161, 169, 19 A. 500 (1890), the Supreme Court said:

> fast that he might just as well not have read it. Nor has the Bank really contended otherwise. *See,* for example, Walter F.'s and Margaret's testimony that in 1971 one of the Bank's vice-presidents told them that the Bank had "made a boo boo." (Record 51a, 61a)

**2.** Judgment may be reserved on whether, if the agreement did provide for indemnification against the results of the Bank's own negligence, it would be invalid as against public policy. *See Spallone v. Siegel,* 239 Pa.Super. 586, 362 A.2d 263 (1976).

Contracts against liability for negligence are not favored by the law. In some instances, such as common carriers, they are prohibited as against public policy. In all cases, such contracts should be construed strictly, with every intendment against the party seeking their protection.

In applying this statement, the Supreme Court and this court have dealt with a wide variety of contracts asserted to be effective to protect one from the results of ones own misconduct. Sometimes the contract has been in the form of an exculpatory clause in a lease, *see, e. g., Kotwasinski v. Rasner,* 436 Pa. 32, 258 A.2d 865 (1969); *Employers L.A.C. v. Greenville B. Men's A.,* 423 Pa. 288, 224 A.2d 620 (1960), and sometimes in the form of an indemnity clause, *see, e. g., Perry v. Payne,* 217 Pa. 252, 66 A. 553 (1907). Nothing, however, turns on this distinction. Thus, in *Dilks v. Flohr Chevrolet,* 411 Pa. 425, 435 n. 11, 192 A.2d 682, 687 n. 11 (1963), the Court said:

While an exculpatory clause—which deprives one contracting party of a right to recover for damages suffered through the negligence of the other contracting party—differs somewhat from an indemnity clause—which effects a change in the person who ultimately has to pay the damages—yet there is such a substantial kinship between both types of contract as to render decisions dealing with indemnity clauses applicable to decisions dealing with exculpatory clauses, and vice versa.

Sometimes the result of the misconduct has been monetary damage to a business, *see, e. g., Camden S. D. & T. Co. v. Eavenson,* 295 Pa. 357, 145 A. 434 (1929); *Crew v. Bradstreet, supra,* sometimes personal injury, *see e. g. Perry v. Payne, supra; Spallone v. Siegel,* 239 Pa.Super. 586, 362 A.2d 263 (1976), and sometimes, most commonly, injury to property, *see, e. g., Kotwasinski v. Rasner, supra; Employers L.A.C. v. Greenville B. Men's A., supra; Galligan v. Arovitch,* 421 Pa. 301, 219 A.2d 463 (1966); *Dilks v. Flohr Chevrolet, supra; Morton v. Ambridge Borough,* 375 Pa. 630, 101 A.2d 661 (1954); *Schroeder v. Gulf Ref. Co.* (No. 2) 300

Pa. 405, 150 A.2d 663 (1930); *Warren C. Lines, Inc. v. United Ref. Co.,* 220 Pa.Super. 308, 287 A.2d 149 (1971). Neither, however, has anything turned on these distinctions. Whatever the contract, the Supreme Court and this court have uniformly held that one will not be protected from the results of one's own misconduct unless the contract provides such protection in so many words.

The rigor with which this principle is to be enforced is illustrated by *Crew v. Bradstreet, supra.* There the contract provided that "the said company shall not be liable for any loss or injury caused by the neglect or other act of any officer or agent of the company [in procuring certain financial information]." It might seem that this language did in so many words provide protection from the results of one's own negligence ("neglect"). Not so. Said the Court: "This contract provides for exemption for the negligence of the officers and agents of the company, *but not from its own.*" 134 Pa. at 169, 19 A. at 500 (emphasis added). If it be suggested that this is strict construction with a vengeance, the reply is that indeed it is: that is the point.

All of the cases show that in construing a contract a court must not do what the dissenting opinion here would do. Protection from the results of one's own negligence must not be found on the basis of general language; if found at all, it must be found in language so clear as to remove any doubt that the other party to the contract understood the extent of the immunity to which he was agreeing. Thus in *Perry v. Payne, supra,* it was said:

> We think it clear, on reason and authority, that a contract of indemnity against personal injuries should not be construed to indemnify against the negligence of the indemnitee, *unless it is so expressed in unequivocal terms.* . . . *No inference from words of general import can establish it.*

217 Pa. at 262, 66 A. at 557 (emphasis added).

This statement is quoted in part in *Camden S. D. & T. Co. v. Eavenson, supra* 295 Pa. at 364, 145 A. 434 where the Court construed an indemnity clause in a lease as not being so

clear and unequivocal as to protect the lessor from his own attempt to damage the lessee's business by terminating her leasehold interest.

*Morton v. Ambridge, supra,* is also an instructive case. There, 375 Pa. at 635, 101 A.2d at 663 the Court said:

Any agreement or instrument by which it is intended to diminish legal rights which normally accrue as a result of a given legal relationship or transaction must spell out the intention of the parties *with the greatest of particularity,* since such contracts or instruments are construed strictly against the party seeking their protection. . . .

(Citations omitted; emphasis added.)

The Court then went on to note that "nowhere [in the contract in question] do the words 'negligent,' 'negligence,' or 'negligently' or words of similar import appear." 375 Pa. at 636, 101 A.2d at 663. Accordingly, the Court construed the contract as not affording protection against one's own negligence. Just so here: The language of the Receipt, Release and Waiver of Audit is general. Nowhere does any such word as "negligence" appear. Consequently, the general language must be construed as not providing protection against negligence. When the dissenting opinion says that "[t]here is no language excluding situations caused by [the Bank's] negligence," and concludes that therefore the general language affords protection against negligence, it is doing precisely what the Supreme Court in *Morton v. Ambridge* said should not be done.

The cases are easily multiplied. In *Dilks v. Flohr Chevrolet, supra* 411 Pa. at 436, 192 A.2d at 688, the Court said that

where a person claims that, under the provisions and terms of a contract, he is rendered immune from and relieved of any liability for negligent conduct on his part . . . , the burden is upon such person to prove . . that the provisions and terms of the contract *clearly* and *unequivocally* spell out the *intent* to grant such immunity and relief from liability. Absent such proof, the claim of immunity fails.

(Emphasis in original.)

*And see Galligan v. Arovitch, supra,* 421 Pa. at 303, 219 A.2d at 465 ("must spell out with the utmost particularity"; the Court also noted that "a written instrument [must] be strictly construed against the maker," citing *Darrow v. Keystone 5, 10, 25, $1.00 Stores, Inc.,* 365 Pa. 123, 74 A.2d 176 (1950)); *Employers L.A.C. v. Greenville B. Men's A., supra* 423 Pa. at 295, 224 A.2d at 624 ("must be expressed with utmost clarity and without any ambiguity"); *Kotwasinski v. Rasner, supra* 436 Pa. at 40–41, 258 A.2d at 868–869 (quoting *Employers* as "controlling").

-5-

The foregoing cases would appear to leave no room for doubt about how this case should be decided. The Bank was negligent (as the dissenting opinion concedes; *and see* footnote 1, *supra* ). The Receipt, Release and Waiver of Audit, however, says nothing about protecting the Bank from the results of its own negligence. Therefore, it must be construed as not so protecting the Bank. Therefore, the Bank's suit must fail, as a matter of law, and judgment n. o. v. should have been entered. ·

An argument might be made that the cases that have been discussed are distinguishable from the present case. The argument might go as follows: The cases discussed all involve a situation where A has been in some way injured by B's negligence. Here that has not occurred: Walter F. and Margaret were not "injured" by the Bank's negligent administration of Walter's trust but were rather "benefited." Reflection will show, however, that this distinction is without substance; the cases discussed and the present case are alike controlled by the same general legal principles that underlie and have shaped the law of negligence.

"Negligence" is conduct that falls below the standard expected of the reasonable man. Restatement of Torts, 2d, § 282–283 (1965). In imposing this standard the law has in mind not so much the welfare of the individual as of the community. Thus the standard is "an objective and external one, rather than that of the individual judgment, good or

bad, of the particular individual." *Id.,* § 283, Comment c. "The words 'reasonable man' denote a person exercising those qualities of attention, knowledge, intelligence, and judgment which society requires of its members for the protection of their own interests and the interests of others." *Id.,* Comment a. "In so far as the conduct of the reasonable man furnishes a standard by which negligence is to be determined, the standard is one which is fixed for the protection of persons other than the defendant . . . . [T]he 'reasonable man' is a man who is reasonably 'considerate' of the safety of others and does not look primarily to his own advantage." *Id.,* Comment f. The mechanism by which this standard is enforced is the action for damages. If in a given instance one is required to pay damages because of negligence, one will have been given a powerful reason not to be negligent again, with the result that the community will be benefited. Nor is this reasoning merely theoretical. Negligence litigation has transformed the manner in which manufacturing is conducted, commerce transacted, and the professions practiced—to cite only general and scattered examples.

It is these considerations that have led to the rule that contracts against liability for negligence "are not favored by the law" and therefore "should be construed strictly, with every intendment against the party seeking their protection." *Crew v. Bradstreet, supra* 134 Pa. at 169, 19 A. at 500. The contracts are not favored because to give them effect would enable a business to be conducted not in a manner reasonably considerate of others but primarily for its own advantage, thereby encouraging negligence rather than discouraging it. By immunizing the business from the results of its own negligence, a principal incentive for being reasonably considerate of others would be removed.

All of this is well illustrated by the present case. Consider the consequences of the dissenting opinion. According to it, the Bank may negligently distribute an estate, perhaps without even reading the will, and up to 20 years later recover what it distributed; and this may be accomplished

on the strength of a document drafted by the Bank, and presented by it for signature to persons not knowledgeable in estate matters. In *Perry v. Payne, supra* 217 Pa. at 261, 66 A. 553 the Supreme Court quoted a statement by the Supreme Court of Virginia that aptly describes such a result:

It would be strange, indeed, if such a doctrine could be maintained. To uphold the stipulation in question would be to hold that it was competent for one party to put the other parties to the contract at the mercy of its own misconduct, which can never be lawfully done where an enlightened system of jurisprudence prevails.

To return now to the suggested distinction of the cases with which this discussion started: It is no answer to the cases to suggest that persons such as Walter F. and Margaret have been "benefited." The Bank is a professional fiduciary. Its business is to be expert in the administration of estates and trusts, and one way it makes its money is by holding itself out to members of the public as being expert, thereby encouraging them to entrust their financial affairs to its management. Persons assured by a professional fiduciary that they are "the sole parties in interest" in the distribution of an estate or trust—as here Walter F. and Margaret were assured—are certainly likely to believe that they are entitled to spend their "inheritance", or to change their style of living in consequence of it. If, 20 years later, the Bank is to be allowed to assert that this belief was mistaken because it "made a boo boo," the very least that it must prove is that the mistaken belief was not its fault. And so the cases hold; that is what they mean when they all say that the intention to escape the results of one's own negligence must be stated "in unequivocal terms," *Perry v. Payne, supra,* "with the greatest of particularity," *Morton v. Ambridge, supra,* and "with utmost clarity and without any ambiguity," *Employers L.A.C. v. Greenville B. Men's A, supra.*

None of this means that banks may never recover overpayments negligently made. One is not precluded from

bringing a suit for restitution because of negligence. Restatement of Restitution § 59. *And see Kunkel v. Kunkel*, 267 Pa. 163, 110 A. 73 (1920) (payment of legacy made without reading will; restitution ordered even though legatee had spent the money). The present suit, however, is not a suit for restitution (and considering the statute of limitations, would not succeed if it were). It is a suit on the Receipt, Release and Waiver of Audit.

For the reasons stated at the outset of this opinion, the judgment of the lower court is reversed and the matter remanded for a new trial.

HOFFMAN, J., files a concurring opinion in which CERCONE, J., joins.

VAN der VOORT, J., files a dissenting opinion in which JACOBS and PRICE, JJ., join.

HOFFMAN, Judge, concurring:

Appellants contend that the lower court erred in admitting into evidence and by sending out with the jury the adjudication and schedule of distribution ordered by the Orphans' Court in a prior proceeding.[1] I agree and would, therefore, reverse and remand for a new trial.

George Tiernan died on May 7, 1933, leaving a will dated July 20, 1932. The will provided that his residuary estate be given to the Fidelity Bank, in trust, to pay the income to his widow for life and on her death to divide the principal into two equal shares, one for his son, Walter G. Tiernan, to pay him the income therefrom and then to his widow until her death or remarriage, and then to pay the income to "all my grandchildren then living and all issue of deceased grandchildren . . . until each of said grandchildren shall attain the age of twenty-five years. As each grandchild attains the age of twenty-five years, his or her share of principal shall be promptly distributed to him or her in the

---

1. Appellants also argue that the lower court erred in refusing to charge the jury on the validity of the indemnity agreement. I do not reach this issue.

same proportions as above provided for income payments." The separate trust for Walter's brother, Arnold, was identical to that described above.

Walter died on March 31, 1963, survived by his two children, appellants herein. Mr. Smithers, a trust officer and attorney for Fidelity Bank, met with appellants in 1963 and advised them that they were the sole beneficiaries under the terms of their grandfather's will and that the entire principal and income would be distributed to them. Fidelity obtained the advice of another attorney, an expert in trusts and estates, who approved immediate distribution of the entire trust principal to appellants. Appellants state that they relied upon the representations of Fidelity Bank that they were the sole beneficiaries of the trust and that distribution to them would be proper. Appellants signed a release, receipt and waiver of audit. This agreement provides:

"We, the undersigned, being the sole parties in interest in this Trust, for the purpose of inducing the Trustee to make distribution without a Court audit,

"1. Acknowledge that we have examined the Trustee's Account and approve the same, which approval shall have the same effect as if the Account had been audited and confirmed absolutely, specifically waiving the statement of income received and distributed prior to December 3, 1962;

"2. Acknowledge receipt of principal in the amount of $62,225.12, consisting of securities of the value of $35,052.19 and cash in the amount of $27,172.93, and income, consisting of cash in the amount of $1,118.84, being our share of the balances of principal and income as itemized therein, and release and discharge the Trustee from any liability in connection with this Trust;

"3. Agree to indemnify the Trustee against all liability, loss or expense which may be incurred as the result of the settlement of this Account, or of the distribution being made upon this Receipt and Release to the extent of our share, and

"4. Waive an accounting of this Trust in the Orphans' Court of Philadelphia County."

The Bank distributed the trust principal to appellants. In fact, this distribution was contrary to the provisions in the will. The trust principal should have been distributed to all five grandchildren.

On November 19, 1968, testator's second son, Arnold, died survived by his widow. The account of Arnold Tiernan was called for audit in 1972 at which time the bank discovered the overpayment to appellants. The orphans' court ordered Fidelity to pay the principal of Walter's share, amounting to $62,225.12 plus income, to all five grandchildren, less any previous distribution. Fidelity was also ordered to pay Arnold's three children four percent interest computed from June 19, 1963, to the date of distribution.

Fidelity then requested that appellants reimburse them for the excess of their father's trust which had been distributed to them. Appellants refused and Fidelity brought this action in assumpsit on the indemnity agreement. After a jury trial, a verdict was returned in favor of Fidelity in the amount of $37,964.70. The court en banc, with one judge dissenting, denied appellants motions for a judgment non obstante veredicto and for a new trial. This appeal followed.

Appellants argue that the lower court erred in admitting into evidence and sending out with the jury, over their objection, the adjudication and schedule of distribution ordered by the Orphans' Court.[2]

2. I note that the dissent treats the indemnity agreement as a contract under seal which creates a twenty-year statute of limitations. I am unable to agree with its analysis. Appellee did not allege in its complaint that the instrument was under seal. When the appellants raised the statute of limitations in new matter, appellees did not reply that the contract was under seal. Appellees introduced no evidence of a sealed instrument. The trial court, in its charge to the jury stated that the instrument was under seal which created a twenty-year statute of limitations. "It is hornbook law that instructions given to a jury must be confined to the issues raised in the pleadings and the facts developed by the evidence in support of such issues . . . Furthermore, where a particular issue is not raised by the pleadings, the fact that evidence on that issue has been received without objection does not authorize an instruction by the

Appellee offered the adjudication and schedule into evidence for several purposes: (1) to prove that Fidelity was surcharged and to show how much it paid, (2) to show that appellants were represented at the prior proceeding, (3) to show that an overpayment was made to appellants, and (4) to prove what the proper distribution to the other three grandchildren should be.

The entire opinion from the Orphans' Court proceeding was received into evidence. This opinion contained a summary of George Tiernan's will and a statement of the subsequent facts. The court found that appellants had received an "overpayment"; that they had signed a receipt and an agreement to indemnify the Trustee against any loss; that appellants were "unjustly enriched"; and that the distribution was contrary to the provisions of the will. The opinion referred to the other three grandchildren as the "injured persons".

Initially, I note that records of judicial proceedings in a former action are competent to prove the proceedings therein.[3] However, judicial records are not admissible when the issues involved in a subsequent action are not the same. "Identity of subject matter, in whole or in part, and identity of parties in interest must unite, to render a disposition in one case admissible in another." *Seabury v. Fidelity Insurance Trust & Safe Deposit Co.,* 205 Pa. 234, 54 A. 898 (1903), *Walker v. City of Philadelphia,* 195 Pa. 168, 45 A. 657 (1900). Further, it is well settled that questions of fact are for the jury to resolve, whether based upon direct or circumstantial

court on that issue." *Heymann v. Elec. Service Mfg. Co.,* 412 Pa. 338, 81 A.2d 442 (1963).

Thus, it was clear error to instruct the jury on a sealed instrument. Nonetheless, I agree that the appellee is not barred by the statute of limitations. Fidelity sued on an indemnity contract. No cause of action arises until the indemnitee actually suffers a loss. *Ashley v. Lehigh and Wilkes Barre Coal Co.,* 232 Pa. 425, 81 A. 442 (1911). Fidelity's cause of action arose when it was forced to pay Arnold's children their share of Walter's trust in 1972.

Thus, the instant action which was begun April 4, 1972, was filed within the six year statute of limitations.

**3.** For example, a record of a divorce action is competent to prove a divorce. See, generally, P.L.E., Evidence § 193.

evidence. *Gordon v. Trovato,* 234 Pa.Super. 279, 338 A.2d 653 (1975).

In the instant case, the orphans' court proceeding involved an accounting of Arnold Tiernan's estate. The court interpreted George Tiernan's will, determined that Fidelity Bank erred in its construction of the will and in its payment to appellants, and ordered Fidelity to pay the proper amount to the three other grandchildren. The validity of the indemnity agreement, which is the basis of the instant action, was not considered or decided in the orphans' court proceeding. Although the opinion of the orphans' court was relevant to show that Fidelity was surcharged the shares of the newly discovered beneficiaries; it was not necessary to introduce the entire opinion. Other, less prejudicial methods of proof, were readily available to the appellee. Because the issue actually litigated in the orphans' court proceeding differed substantially from that of the case at bar, it was error to admit the opinion into evidence. Moreover, it was clearly an abuse of discretion by the lower court to permit the opinion to be taken out with the jury. The opinion contained findings of fact and conclusions of law that were highly prejudicial to appellants. The opinion stated that the appellants had entered into an indemnity agreement in which they agreed to compensate appellees for any loss they might suffer as a result of the waiver of a court audit. The jury, as laypeople, could have been influenced by the opinion of a judge. The facts were for the jury to decide, not to be read by them from an opinion in a collateral proceeding. Further, the opinion contained inflammatory language that undoubtedly resulted in prejudice to appellants. The use of the words "unjust enrichment" to describe appellant's gain; and "injured persons" to describe the other grandchildren is clearly prejudicial.

I would hold that it was error to admit the opinion as evidence and error to send it out with the jury. I would, therefore, reverse and remand for a new trial.

Four judges of our Court agree with this result.

CERCONE, J., joins in this concurring opinion.

236

VAN der VOORT, Judge, dissenting:

The instant appeal arises out of an action in assumpsit instituted in 1972 to recover monies paid by plaintiff-appellee to defendants-appellants. The appellee Bank was the testamentary trustee under the Will of George H. Tiernan, who died on May 7, 1933. The appellee brought this indemnification action against appellants to recover overpayments made to appellants as a result of a misconstruction of the Will. A jury trial was held on April 2nd and 3rd, 1974, and a verdict returned in favor of appellee in the sum of almost thirty eight thousand ($38,000.00) dollars.

The record shows that the Will in issue provided that the residuary trust would be divided into two equal shares; one for the Testator's son, Walter G. Tiernan, for his life; the other to pay the income to the Testator's other son, Arnold J. Tiernan, for life. Upon the death of a son, his widow not surviving, the principal was to be distributed to and among "all my grandchildren". When Walter died a widower on March 31, 1963, he was survived by two children, the above named defendants. The other son, Arnold, was still living and he had three children. Upon an informal accounting without any audit before the Orphans' Court, the trustee distributed Walter's entire share to his own children, the defendants, ignoring the rights of Arnold's three children. At the time of distribution, the Bank discussed distribution without audit with defendants, and suggested that they sign a paper entitled "Receipt, Release and Waiver of Audit". The agreement provides: "We, the undersigned, being the sole parties in interest in this trust, for the purpose of inducing the trustee to make distribution without a Court audit, 1. Acknowledge that we have examined the Trustee's Account and approve the same . . . 2. Acknowledge receipt of principal in the amount of $62,225.12 . . and income, consisting of cash in the amount of $1,118.84 . . ." and "3. Agree to indemnify the trustee against all liability, loss or expense which may be incurred as the result of the settlement of this account, or of the distribution being made upon this Receipt and Release to the extent

of our share." The document was signed and sealed by the two defendants-appellants on July 19, 1963.

On November 19, 1968, Testator's other son, Arnold, died survived by a widow. At a formal accounting of Arnold's share of the trust, the overpayment to the appellants was discovered. Appellee Bank advised appellants of the error which it had made and asked that it be reimbursed for the excess share of their father's principal which had been distributed to them. Appellants pleaded their inability to repay the excess because they had spent the same.

Thereafter, the Bank prepared and filed a formal account of Walter's share, and on October 19, 1972, the Bank was ordered by adjudication of the Orphans' Court Division to pay the principal of Walter's share, amounting to $62,225.12, plus income, to all five grandchildren of Testator. Fidelity was also surcharged the full shares to be paid to the three first cousins of the appellants, together with four percent interest computed from June 19, 1963 to date of distribution.

The appellants have not contested the existence of the erroneous payment. Rather, they offer several defenses and or claims of trial error in an effort to avoid repayment. I would find no merit in any of the arguments raised by appellants.

Initially, appellants contend that appellee's claim was barred by a six year statute of limitations, noting that the alleged wrongful payment was made in 1963, while suit was not instituted until 1972. The appellant apparently relies upon the Act of March 27, 1713, 1 Sm.L. 76, § 1, 12 P.S. § 31. It is evident that appellants in raising this argument, have ignored the fact that the indemnity agreement was under seal, creating a twenty year "period" of limitations.[1] See

1. In Footnote 1 of the Opinion authored by my colleague Judge HOFFMAN, it is maintained that there was no allegation in the complaint that the contract was under seal. I must respectfully disagree. Paragraph two of the complaint referred to the indemnity agreement and noted that: "A true and correct copy is attached hereto, made a part hereof and marked Exhibit 'B' ". Thus, the sealed document was clearly a part of the complaint of the plaintiff-appellee.

*Transbel Investment Company, Inc. v. Scott,* 344 Pa. 544, 26 A.2d 205 (1942).

The appellants next argue that the Bank's action is "insufficient as a matter of law" since the claim for indemnification on the contract is based upon the Bank's own negligence. I have heretofore recited the exact words of the indemnification agreement, which with clarity, evince the appellants' unconditional intent to indemnify the Bank against *any* liability, loss, or expense arising due to the distribution. There is no language excluding situations caused by appellee's negligence from the appellants' assumption of indemnification liability. Contrary to the position taken by Judge SPAETH, in his Opinion, I cannot accept appellants' claims that the indemnification language is unclear, susceptible to differing interpretations, or otherwise ambiguous in conveying the intent of the parties to the instrument.

Next, it is contended by appellants' that the appellee's distribution resulted from a mistake of law rather than a mistake of fact. It has been established, *in cases based upon common law assumpsit principles, and absent express indemnification agreements,* that a party may recover an erroneous payment if such payment was made upon a mistaken apprehension of facts, but may not recover when payment was based upon a mistake of law. See *Kunkel v. Kunkel,* 267 Pa. 163, 110 A. 73 (1920). In the instant case, the lower court submitted the issue to the jury of whether the appellee had made a mistake of fact or a mistake of law in making excess payment in 1963. The jury determined that a mistake of fact had occurred. In my view, the submission of that issue to the jury, its finding, and the arguments to the contrary by appellant are all inconsequential to the material issues in this case. As noted above, the appellee instituted this action as an indemnification action, based upon an express written contract under seal, rather than upon common law assumpsit principles which might require restitu-

tion in certain circumstances of wrongful payment.[2] Compare *Ferguson v. Yard,* 164 Pa. 586, 30 A. 517 (1894) and *Montgomery's Appeal,* 92 Pa. 202 (1879), which both refer to the absence of a "refunding bond". The question of whether the mistake was one of law or fact is not therefore germane to the ultimate resolution of the case. Moreover, an action based upon common law restitution principles would have been outside the statute of limitations in this case where overpayment was made in 1963 and suit filed in 1972. See the Act of March 27, 1713, 1 Sm.L. 76, § 1, 12 P.S. § 31.

The appellant raises a multitude of challenges to the lower court's rulings concerning the admission of certain evidence and to its charge to the jury. I have reviewed all such claims and find them to be without merit.[3]

I must respectfully dissent.

JACOBS and PRICE, JJ., join in this dissenting opinion.

2. Appellants' counsel during a conference in chambers that was transcribed stated that this was the nature of the appellee's cause. Neither the appellee's attorneys nor the lower court indicated disagreement with this statement.

3. Contrary to the views expressed in the Opinion authored by Judge HOFFMAN in this case, I find there to be no basis for concluding that reversible error occurred with the introduction of the prior adjudication of the Orphans' Court at the trial of the instant case. This document was not an opinion, as that opinion notes, but rather an adjudication denominated as such by the Orphans' Court setting forth the facts upon which that Court relied in surcharging the Appellee Bank. In the instant action, the claim of the bank was based upon the indemnity agreement to which it and the Appellants were parties. The primary and best evidence necessary to support the Appellee Bank's claim was the final adjudication of the Orphans' Court which determined that the earlier payment to Appellants had been excessive and erroneous. I cannot imagine better evidence to support the claim, and a relitigation of the issues resolved in the prior adjudication would surely have violated rules of *res judicata.* Unlike Judge HOFFMAN, I find no commentary in the adjudication which could be deemed to have had any possible prejudicial effect on the jury.